## A11A2282. In re ESTATE OF HARING.

(726 SE2d 86)

BARNES, Presiding Judge.

The executor of Clorina Haring's will petitioned the probate court for a final accounting and settlement from James McQuien, who served as Haring's guardian and conservator for five and a half years before her death.[1] Following a two-day bench trial, the probate court issued a detailed order denying the relief sought in the petition, discharging McQuien and his surety from any further estate obligations, and awarding attorney fees to McQuien and the surety. The executor appeals, challenging five specific findings of fact and conclusions of law, the discharge of the surety, and the attorney fees award. For the reasons that follow, we affirm.

1. OCGA § 29-5-81 (a) provides that the personal representative of a deceased ward may petition the court for an order requiring a conservator to submit to a final settlement of the conservator's accounts from the commencement of the conservatorship. After notice, the court must examine the conservator's returns and accounts during the settlement period and hear any objection to discharging the conservator. OCGA § 29-5-81 (c). Finally, "[i]f the court is satisfied that the conservator has faithfully and honestly discharged the office, an order shall be entered releasing and discharging the conservator from all liability." OCGA § 29-5-81 (d).

> Because the [probate] court sits as the trier of fact when settling a conservator's accounts, its findings based upon conflicting evidence are analogous to a jury verdict and should not be disturbed by a reviewing court if there is any evidence to support them. When the evidence is uncontroverted and no question of witness credibility is presented, however, the [probate] court's application of the law to undisputed facts is subject to de novo appellate review.

(Citation and footnote omitted.) *In the Interest of Hudson*, 300 Ga. App. 340 (685 SE2d 323) (2009). See *Fletcher v. Ellenburg*, 279 Ga. 52, 56 (1) (609 SE2d 337) (2005); OCGA § 9-11-52 (a).

The evidence presented to the court established that Haring and McQuien began living together in 1974. In March 2001, McQuien and Haring's son Walter petitioned the probate court to have

---

[1] Effective July 1, 2005, the General Assembly adopted a comprehensive revision of Title 29, "Guardian and Ward," under which the term "guardian" replaced "guardian of the person" and the term "conservator" replaced "guardian of the property." Ga. L. 2004, p. 161, § 1. We will use the current terminology in this opinion, even though the events at issue began before 2005.

McQuien appointed as Haring's guardian because she had developed Alzheimer's and was no longer competent to take care of her affairs. In May 2001, the court appointed McQuien as the guardian of Haring's person and property, and McQuien obtained a $310,000 bond from Western Surety Company. McQuien filed annual account returns and reports on Haring's condition with the probate court until Haring died on December 26, 2006. Walter Haring was the executor of Haring's will, which was admitted to probate court in March 2007.

In April 2007, the executor petitioned the probate court for an accounting from McQuien, asserting that McQuien had failed to deliver Haring's money and property, and "may have breached his legal duties as conservator." In May 2007, McQuien filed revised returns and submitted a response to the petition, denying he had breached his conservatorship duties and asserting that the executor had already received Haring's house, jewelry, car, and $70,000.

After the parties conducted discovery, the probate court held a two-day bench trial on the executor's petition for a final settlement of McQuien's accounts as the conservator of Haring's property. The evidence showed that when McQuien became Haring's guardian and conservator, Haring had approximately $250,000 in cash and certificates of deposit (CDs), and when she died, she had $70,000 left. The executor asserted that McQuien had failed to properly account for the money he spent, spent more than necessary for Haring's care, and spent some of the money improperly. Fifteen people testified, including experts in assisted living and home health care as well as fact witnesses.

The evidence established that Haring was diagnosed with Alzheimer's in 1997, and became progressively disabled. When McQuien applied for the guardianship, Haring could not take care of herself. Her son wanted to put Haring in a nursing home, but McQuien said that as long as he was alive and able to care for her, he would not do that. McQuien paid a sitter $8.50 an hour to stay with Haring while he was at work. During his 67-month conservatorship, McQuien wrote checks to the sitter totaling $140,282, and paid her additional sums in cash. The sitter testified that McQuien kept track of her hours and paid her at least weekly. Haring testified that he paid the sitter more often than weekly when she needed it. She took Haring for rides in Haring's car, which two experts testified was therapeutic for Alzheimer patients. McQuien also wrote checks to himself and for cash during this period that totaled $82,888, and testified that he used some of that to pay the sitter in cash and the rest for food and other household expenses. He also testified that the source of Haring's certificates of deposit was the $725 monthly rent payments he made to Haring from 1974 to 1998, which Haring never spent. In

2005, he asked Haring's sons to cash in some certificates because the money in Haring's checking account was "getting low," but they refused, so he cashed in other CDs for $43,000.

McQuien's experts testified that the cost of institutional care for Haring, who was non-ambulatory, non-verbal, and could not feed, bathe, or dress herself, would have been $40,000 to $70,000 a year, plus clothing and medical expenses. The hourly wage for a sitter hired through an agency would have been $14.50 to $15.00 per hour in 2008, and Alzheimer patients did better "mentally and cognitively" when they were kept at home instead of in an institution.

A social worker who visited Haring for an hour two to three times a month to monitor her care testified that McQuien took "wonderful" care of Haring. He declined the assistance of a certified nursing assistant and bathed her, changed her diapers, pureed her food, gave her nutritional supplements, and did her laundry daily. While the house was sometimes in disarray, Haring was always clean, dressed, and sitting on her sofa instead of left in her bed as many such patients were. She became "very vibrant" and animated when McQuien came into the room, and without his care probably would have passed away many years earlier. A registered nurse who visited once a week for an hour testified that, although Haring had advanced Alzheimer's and was non-verbal, "you could see her face light up" when McQuien entered the room.

During McQuien's conservatorship, Haring's sons did not contribute to her care, physically or monetarily, nor did they review McQuien's annual reports to the probate court. George Haring testified that he had no need to talk to his mother's sitter about her qualifications because he intuited that, she was not qualified. He thought her appearance was unprofessional, although when asked in what way, he responded that he could not explain it. Walter Haring, the executor, testified that Haring left a television set to McQuien and everything else to him and his brother. Her will was written in 1976. After Haring died, the sons came to the house and accused McQuien of neglecting their mother and stealing her money. They "ransacked the house," "looking for things that . . . belonged to [them]." They told McQuien to separate his things from their mother's and took her jewelry, car, and almost all of the furniture, which was sold at a yard sale for "a couple of dollars." They made McQuien leave the house, and sold it a year later for $43,000.

In its 14-page order, the probate court found that McQuien spent less money than it would have cost to care for Haring in a licensed facility, and that money paid from the estate account to the sitter and to McQuien was reasonable. The court noted that Haring's sons did not review or object to McQuien's conservatorship returns, and

found that, to the extent the returns were imperfect, "they reflect [McQuien's] level of sophistication rather than any willful or intentional dishonesty." The court accepted his amended returns, found no evidence that McQuien converted any of Haring's money to his own personal use, and that McQuien did not breach any of his fiduciary duties to Haring. The court denied the relief sought by the executor, discharged McQuien and his surety from further obligation to the estate, and found it appropriate to award reasonable attorney fees and expenses to McQuien from the estate or heirs.

After reviewing the evidence, we conclude that the probate court's findings of fact and conclusions of law are not clearly erroneous, and therefore the appellant's first six enumerations of error are without merit.

2. The executor contends that the probate court erred in awarding attorney fees to McQuien and the surety from the estate and heirs. The court found that the executor's claims against McQuien lacked merit, that the executor was not entitled to attorney fees from McQuien or the surety, and that McQuien and the surety were entitled to reasonable attorney fees and expenses to be paid from the estate. The probate court ordered that the fee award be paid from estate assets, but "[t]o the extent that the assets of the estate have been distributed, the claim for attorney[ ] fees shall stand as an obligation of each of Ms. Haring's heirs, jointly and severally," citing OCGA §§ 53-7-43;[2] 53-7-54 (a), (b).[3]

The executor contends that the probate court erred in awarding any fees, and that even if a fee award was appropriate, it should not have been made against the heirs individually. We disagree.

The probate court "may apply equitable principles in making settlements and accounting for the assets of estates. . . . The question of allowing . . . counsel fees comprises a part of the distribution and disposition of the assets of a deceased person's estate." (Citation and punctuation omitted.) *Estes v. Collum*, 91 Ga. App. 186, 190-191 (1) (a) (85 SE2d 561) (1954). The probate court's award of attorney fees to McQuien and the surety is also supported by OCGA § 29-5-51,

---

[2] "If the estate shall have been distributed to the heirs or beneficiaries without notice of an existing debt, a creditor may compel them to contribute pro rata to the payment of the debt."

[3] If a personal representative . . . commits a breach of fiduciary duty . . . , a beneficiary of a testate estate . . . shall have a cause of action:
    (1) To recover damages;
         . . .
    (4) To compel the redress of a breach of fiduciary duty by payment of money or otherwise[.]
    (b) When estate assets are misapplied and can be traced in the hands of persons affected with notice of misapplication, a trust shall attach to the assets.

which provides:

> Conservators shall be allowed reasonable expenses incurred in the administration of the estate, including without limitation expenses for travel, employing counsel and other agents, and the expenses and premiums incurred in securing a bond. Such reasonable expenses shall be determined after notice, if any, as the court shall direct. The conservator's commissions are part of the expense of administering the estate and may be charged against the corpus of the estate as well as the income of the estate.

The executor withdrew everything from Haring's checking account before outstanding checks for Haring's bills cleared, causing some of those checks to be dishonored. McQuien then paid those bills from his own funds. Further, the executor filed this action against the conservator for a final accounting before the accounting was due, while the conservator still had an outstanding claim for commissions. Thus, the executor distributed funds from the estate knowing that the estate had outstanding debts. Under OCGA § 53-7-43, the heirs may be liable for debts of the estate even if they took without notice of the debt.

We review for abuse of discretion a probate court's determination regarding the reimbursement of attorney fees. *In re Estate of Arnsdorff*, 273 Ga. App. 612, 616 (3) (b) (615 SE2d 758) (2005). The probate court determined that McQuien and the surety were entitled to be reimbursed from the estate or heirs for the attorney fees and expenses they incurred in making a final accounting, and after reviewing all of the evidence of record, we cannot find that the probate court abused its discretion in making this award.

*Judgment affirmed. Adams and Blackwell, JJ., concur.*

DECIDED MARCH 13, 2012.

*Philip J. Johnson*, for appellant.

*Posey, Moye & Cartledge, John D. Cartledge, Bovis, Kyle & Burch, Timothy J. Burson*, for appellee.